# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARK MILHOUSE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>   v.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware limited liability company; ROBINHOOD SECURITIES, LLC, a Delaware limited liability company; ROBINHOOD MARKETS, INC., a Delaware corporation,<br><br>                 Defendants. | Case No.: |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Mark Milhouse, by and through his attorneys, brings this putative class action against Defendants Robinhood Financial LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), demanding a trial by jury. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief:

### NATURE OF THE ACTION

1.      Robinhood is an online brokerage firm that offers commission-free trading for stocks and options to the general public. As its namesake suggests, Robinhood touts itself as "a financial product that would enable everyone—not just the wealthy—to access financial markets."[1]

2.      Robinhood makes money by selling its users' trade orders to larger financial institutions, often referred to as market makers, which execute the trades and utilize the order

---

[1]      ROBINHOOD, *Meet our founders*, http://bit.ly/30BoJ3x (last visited Mar. 12, 2021).

information to inform their own investment strategies. At the core of Robinhood's business is an incentive to grow its userbase and maximize the orders placed through its application.

3.      Robinhood accomplishes this by offering inexperienced retail investors a free, easy-to-use product that gives them access to sophisticated investment opportunities, including options and margin trading. Robinhood's product contains other strategic features, such as notifications encouraging users to invite friends and check out "popular" stocks, that are designed to grow its userbase and order flow.

4.      In early 2021, Robinhood's userbase experienced exponential growth as an expanding online community of retail investors took notice of several dark horse stocks that appeared to be undervalued. These stocks included companies liked GameStop, AMC, Blackberry, Nokia, and others that had all been heavily shorted by institutional investors. Investors who take "short" positions on a company's stock essentially bet on the company's failure or decline in the company's stock value.

5.      As these heavily shorted stocks captured the attention of the retail investing community—namely, over a Reddit forum called r/WallStreetBets—new and existing customers of Robinhood's trading application piled onto the platform to take the opposite position of the short sellers. Robinhood users took "long" positions on the stock, meaning they purchased the stock with the belief and intention that the stock would increase in value over time. Thanks to new demand generated for the stocks online and with Robinhood's encouragement to its users to check out these "popular" stocks, as well as Robinhood's easy access to the market, Robinhood's customers purchased the stocks in droves and quickly became the driving force of a historical short squeeze. A "short squeeze" occurs when a stock or other asset rises sharply in value, exposing the short sellers to potentially limitless loss. The short squeezes that occurred through Robinhood's platform in the final weeks of January 2021 caused tremendous losses to hedge funds and other institutional short sellers at the hands of ordinary, average retail investors.

6.      On January 28, 2021, Robinhood suddenly and without notice blocked its users

from trading these shorted stocks. While retail investors who largely relied on Robinhood's application for access to the market were effectively blocked from it, institutional investors utilizing other platforms were free to trade as usual. Robinhood's unprecedented restrictions sent a wave of panic and confusion through the fast-growing retail investor community, essentially sparking a sell-off and causing the stocks to plummet in value. As a result of Robinhood's trading restrictions, the short positions taken by hedge funds and other financial institutions restored to order as the long positions taken by Robinhood's users rapidly declined.

7.      According to Robinhood, the trading activity on its platform had become so voluminous and the trades themselves were so volatile that the company was forced to restrict the most volatile trades—which happened to be the stocks in highest demand among Robinhood's users—to settle the demands of the clearinghouse that clears and settles the trades.

8.      In other words, on January 28, 2021, Robinhood ran out of the money required to execute certain user trades.

9.      Meeting the depository requirements of the relevant clearinghouse is among the most basic and rudimentary elements of the broker-dealer business. All broker-dealers are subject to daily deposit requirements, which are methodologically calculated based on the financial risks assumed by the broker-dealer. FINRA-regulated broker-dealers are required, as part of their standard duty of care, to manage the financial, regulatory, and other risks associated with their business activity, which includes determining appropriate capital thresholds, having an effective liquidity management plan, conducting stress tests in a manner and frequency that is appropriate for the firm's business model (and incorporating the results of those stress tests into the firm's business model), and developing liquidity contingency plans that include a process for accessing liquidity during a stress event. By failing to have enough cash on hand to satisfy the clearinghouse's demands at a time when access to the markets was (foreseeably) critical to Robinhood's users, Robinhood breached obligations owed to its users and caused them substantial losses.

10.    Robinhood's alleged inability to meet its clearinghouse demands does not exculpate the company's actions; rather, it was one event in the causal chain of Robinhood's negligence, which caused significant and foreseeable damage to its userbase. As explained below, Robinhood capitalized on every opportunity to get rich off its growing userbase and reaped the benefits of their volatile trading activity, but it failed to control the risks. It must accept fault and be held accountable for this negligent and unjust conduct.

11.    Plaintiff brings this class action on behalf of Robinhood users whose investment positions were harmed as a result of Robinhood's market restrictions on January 28, 2021. Plaintiff asserts putative class action claims including negligence, unjust enrichment, and violations of state consumer protection laws. Plaintiff seeks, on behalf of himself and all other Robinhood users who are similarly situated, damages, restitution, and disgorgement.

## PARTIES

12.    Plaintiff Mark Milhouse is a natural person and citizen of the State of Illinois.

13.    Defendant Robinhood Markets, Inc. is a financial services holding company organized under the laws of Delaware, whose subsidiaries, including Defendant Robinhood Financial LLC, provide financial and investment services via an internet/cloud-based platform that is also available on mobile phones.

14.    Defendant Robinhood Financial LLC is a limited liability company organized under the laws of Delaware and a broker-dealer with headquarters located at 85 Willow Road, Menlo Park, California 94025. Its subsidiary, Defendant Robinhood Securities, LLC, is a broker-dealer firm located at 85 Willow Road, Menlo Park, California 94025.

15.    Defendants Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood Securities, LLC (together, "Robinhood") provide internet and mobile phone-based securities broker-dealer services to approximately 13 million customers/users.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

17.    This Court has personal jurisdiction over Defendants because Defendants conduct business in the State of Illinois.

18.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District and because a substantial part of the events or omissions giving rise to the Plaintiff's and the putative Class's claims arose, in a substantial part, in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Robinhood's Business Model

19.    Robinhood launched its retail brokerage business in 2015 with the stated mission to "democratize finance for all." Robinhood's customers can place securities trades, including option contracts, through the firm's website and by using a web-based application (or "app").

20.    Since its inception, Robinhood has experienced a rapid growth in its customer base, thanks in part to Robinhood's easy access to the market. Between 2016 and 2018, Robinhood grew its customer accounts from approximately one million to approximately six million users, a 500% increase. By mid-2018, it was one of the largest retail broker-dealers in the United States. By mid-2020, Robinhood had approximately 13 million customer accounts. Robinhood added 3 million customers to the market in 2020 alone.[2]

21.    The rapid use and expansion of Robinhood's trading platform is central to its business model and critical to the firm's financial success. As explained below, Robinhood's primary source of revenue depends on the number of trades Robinhood's customers order. Accordingly, Robinhood engages in aggressive marketing tactics to encourage more and more customers to open accounts, and once these accounts are opened, the platform uses a number of strategies designed to encourage continuous and repeated engagement.

---

[2]    David Curry, *Robinhood Revenue and Usage Statistics* (2021), BUSINESS OF APPS (Mar. 8, 2021), http://bit.ly/3cvchHU.

**A.      Robinhood's Revenue Depends On High Volume Order Flow**

22.      One of Robinhood's primary selling points is that it is "a pioneer in commission-free investing," meaning it allows users to place orders to buy and sell securities without paying a trading commission. In lieu of commissions and fees, Robinhood earns revenue through a practice known as payment for order flow.

23.      Payment for order flow is a practice in which retail broker-dealers route trades to other broker-dealers (often referred to as "principal trading firms" or "electronic market makers"), rather than sending them directly to national exchanges for execution. Principal trading firms, seeking high volumes of customer orders, offer retail broker-dealers like Robinhood "payment for order flow," which is defined in Rule 10b-10(d)(8) of the Exchange Act to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders.

24.      In short, when Robinhood's customers trade more, Robinhood is paid more for the order flow.

25.      Payment for order flow has been portrayed as a controversial practice because it has the potential to create a conflict of interest between the retail broker-dealer and its customer.[3] The broker-dealer's attempts to negotiate a higher payment for order flow revenue may result in less money available for the principal trading firms to provide price improvement to the broker-dealer's customers. Thus, the practice is only permitted by SEC rules if it does not interfere with the broker-dealers' efforts to obtain the best possible terms in executing customer trades (known as the duty of best execution), and as long as the routing of that order flow is adequately disclosed.

26.      Payment for order flow is Robinhood's largest source of revenue. In 2020, payment for order flow accounted for $90 million in revenue for Robinhood for the first quarter

---

[3]      *'Flash Boys' investigates how high-frequency traders anticipate Wall Street's next move faster*, PBS NEWS HOUR (Apr. 4, 2014), http://to.pbs.org/3rVcM4R.

(i.e., 70 percent of its revenue), and by the second it doubled to $180 million.[4]

27.     For comparison, at Robinhood's competitor E-Trade Financial Corporation, payment for order flow only accounts for 17% of revenues; at Charles Schwab Corporation, 3%.[5]

28.     Recently, Robinhood's payment for order flow model has come under regulatory scrutiny. In December 2020, the SEC charged Robinhood with costing its unsuspecting customers more than $34 million in aggregate losses and making misstatements about the firm's revenue sources. According to the SEC, Robinhood charged unusually high payments from principal trading firms for the opportunity to obtain Robinhood's customer order flow, which caused the trading firms to execute the trades of Robinhood's customers at inferior execution prices.[6] Robinhood agreed to pay $65 million to settle the action.

**B.      Robinhood Targets and Manipulates Users to Achieve Higher Conversion Rates and Engagement.**

29.     Because its revenue relies primarily on payment for order flow, the core of Robinhood's business is to encourage more trading. Robinhood's business strategy thus optimizes and prioritizes the growth of its platform over healthy and sustainable markets.

30.     Robinhood's advertising targets younger individuals who have limited or no investment experience.

31.     Robinhood's application contains many features that are designed to encourage inexperienced investors to execute trades frequently, even if to the customer's financial detriment.

32.     For example, one of the first items that a new user sees on the homescreen of Robinhood's application is a list of securities containing "popular" investments among Robinhood customers, which users can trade with just the touch of the screen. Robinhood

---

[4]     Jeff Kauflin and Antoine Gara, *The Inside Story Of Robinhood's Billionaire Founders, Option Kid Cowboys And The Wall Street Sharks That Feed On Them*, FORBES (Aug. 19, 2020), http://bit.ly/2Q15gqT.

[5]     *Id.*

[6]     *In the Matter of Robinhood Financial, LLC*, Release No. 10906 (Dec. 17, 2020), https://bit.ly/3rMFgxA.

bombards its users with information about "popular" stocks because it understands that this information—coupled with the ease of use of its platform—will influence unsophisticated investors to purchase these stocks, even though they may be risky financial decisions.

33.    Similarly, Robinhood sends daily push notifications to customers with information like the change in value of stocks in their accounts because it understands that its target investor will be more likely to execute trades on the application the more they interact with it. Upon information and belief, Robinhood sends specific push notifications to users that meet specific criteria. For instance, Robinhood might send a push notification to a customer that has not yet traded in their account, stating: "Popular Stocks: Can't decide which stocks to buy? [thinking emoji] Check out the most popular stocks on Robinhood."[7] While Robinhood has frequently denied that these communications count as "recommendations," these notifications can reasonably be viewed as a call to action because they are designed to influence users into investing and would reasonably influence a user to invest in a "popular" stock.

34.    Robinhood has received criticism for using these gamification strategies to manipulate customers into continuously and constantly engaging with its platform. Gamification involves tactics used to engage customers to transact, such as increasing use of notifications, prizes, and other psychological tools and design elements to increase rapid trading and short-termism, instead of a more cautious approach. [8]

35.    To illustrate another example of Robinhood's gamification strategies, in late 2019, Robinhood deployed a new cash management feature with an early access waitlist for Robinhood customers, where customers had the ability to improve their position on the waitlist by "tapping" a fake debit card displayed in the application up to 1,000 times per day.[9] This encouraged Robinhood customers to interact with the application on a daily basis in order to

---

[7]    *See Robinhood May Be Liable If You Lose Money Based On Its Recommendations*, STOCK MARKET LOSS (Feb 2, 2021) http://bit.ly/2Nd82br.

[8]    *See, e.g.*, Annie Massa and Edward Robinson, *Robinhood's Role in the 'Gamification' of Investing*, WASH. POST (Dec. 21, 2020), http://wapo.st/2OOTy1M.

[9]    Scott Galloway, *Robinhood Has Gamified Online Trading Into an Addiction*, MARKER (Jun. 22, 2020), http://bit.ly/3ey9fFr.

protect their position on the waitlist, and it was designed with the idea that users would be influenced to frequently engage with the app, which would result in higher-frequency trading.

36.     As the New York Times has explained, Robinhood's "success appears to have been built on a Silicon Valley playbook of behavioral nudges and push notifications, which has drawn inexperienced investors into the riskiest trading . . . . And the more that customers engaged in such behavior, the better it was for the company."[10]

37.     Indeed, Robinhood's users appear to trade more often, faster, and with more risk than traders who use other platforms. According to an analysis of new filings from nine brokerage firms by the research firm Alphacution for The New York Times, in the first quarter of 2020, Robinhood users traded nine times as many shares as E-Trade customers and 40 times as many shares as Charles Schwab customers. They also bought and sold 88 times as many risky options contracts as Charles Schwab customers, relative to the average account size.[11]

## C.     Robinhood Optimizes Risky Investing Practices

38.     The more risk Robinhood's customers take in their trades, the more Robinhood profits from their order flows.[12] Unlike most of its competitors, Robinhood's payments for order flow are based on a percentage of the spread on each trade, rather than a fixed amount.[13] This arrangement incentivizes Robinhood to push options trading onto its customers because options are less liquid than stocks and tend to trade at higher spreads. Robinhood's burgeoning options platform is thus a key component of the company's earnings.

39.     According to a report by Piper Sandler, Robinhood gets paid 58 cents per 100 shares of options contracts versus only 17 cents per 100 shares for equities; according to Bloomberg Intelligence, the platform earned an average of about 64 cents per options contract executed in December 2020, compared to about 36 cents for every 100 shares of S&P 500

---

[10]     Nathaniel Popper, *Robinhood Has Lured Young Traders, Sometimes With Devastating Results*, N.Y. TIMES (July 8, 2020) http://nyti.ms/3ljGzBG.

[11]     *Id.*

[12]     Kauflin and Gara, *supra* note 4.

[13]     Kate Rooney and Maggie Fitzgerald, *Here's how Robinhood is raking in record cash on customer trades – despite making it free*, CNBC (Aug. 13, 2020), http://cnb.cx/38QnYbd.

companies that month.[14] While Robinhood recently tried to downplay the importance of options trading to its business strategy when questioned by Congress about its risky business model—stating that only 12% of its customers trade options—those options trades accounted for 62% of Robinhood's order flow revenues in the first half of 2020 alone, which totaled approximately $270 million.[15]

40.     Options trading accounted for $440 million, or roughly two-thirds, of Robinhood's order-flow revenue from equities bets in 2020.[16]

41.     Robinhood actively encourages its customers to pursue option trading. Robinhood prompts users to state their investment experience upon opening an account as part of its process for approving customer accounts for options trading. Customers who self-report that they have significant investment experience (e.g., by selecting "I'm an expert") are invited to apply to trade options.[17] Robinhood also alerts existing customers about the opportunity to apply for options trading through unsolicited notices, such as when they access their account menu tab or seek to change their order type (e.g., stop order, limit order, stop limit order, etc.) from the default type for a stock order.

42.     Robinhood likewise encourages its customers to utilize margin trading. Robinhood's default account for new users is the "Instant" account. As its website explains, this is a margin account, which means that Robinhood lends the investor money to buy securities so

---

[14]     Annie Massa and Sarah Ponczek, *Robinhood's Lucrative Options-Trading Platform Attracts Mounting Scrutiny*, BLOOMBERG (Feb. 4, 2021), http://bloom.bg/3sfBLjr.
[15]     Kauflin and Gara, *supra* note 4, 12; *see also* ROBINHOOD, *Robinhood Securities - Held NMS Stocks and Options Order Routing Public Report, 2nd Quarter, 2020* (July 28, 2020), https://bit.ly/3losNgY.
[16]     Massa and Ponczek, *supra* note 14.
[17]     *See* Letter from David Dusseaul to Congressman Brad Sherman, et al., (Aug. 7, 2020), https://on.wsj.com/3rIV2JK.

that investors do not have to wait for their deposits to clear before they can start trading:

# Why are instant bank transfers useful?

With Robinhood Gold, you get larger instant deposit amounts so you can use your money immediately instead of waiting up to five business days for your funds to clear. If you see an opportunity in the market, you can invest by increasing your buying power right away.

**Figure 1: Robinhood's website explains its immediate trade opportunities[18]**

43.     Robinhood uses margin accounts as their default trading option in order to ease user onboarding and encourage instant trading.[19]

# Robinhood Instant

When you sign up for a new account, you'll automatically start with a Robinhood Instant account, which is a margin account. This means you'll have access to instant deposits and extended-hours trading. You also won't have to wait for your funds to process when you sell stocks or make a deposit (up to $1,000).

**Figure 2: Robinhood's website describes its default account offering**[20]

44.     Robinhood also offers a paid subscription upgrade called "Gold" for a $5 monthly fee, which Robinhood advertises as a way for customers to gain extra buying power:

45.     Users with "Gold" accounts can borrow additional funds on margin (i.e., beyond the $1,000 available under an "Instant" account) but have to pay an annual interest rate on the loans.

---

[18]     ROBINHOOD, *Bigger Instant Deposits*, http://bit.ly/2PYv1YV (last visited Mar. 12, 2021).
[19]     Josh Constine, *Robinhood Ditches 3-Day Wait, Fronts New Users $1000 To Buy Stocks*, TECHCRUNCH (Feb. 23, 2016), http://tcrn.ch/30FQMi5.
[20]     ROBINHOOD, *Robinhood Accounts*, http://bit.ly/2Nh1fxA (last visited Mar. 12, 2021).

46.    Robinhood's lending so that customers could "buy on margin" more than doubled in the first six months of 2020.[21] According to its latest unaudited Form X-17A-5 filing, as of mid-2020, Robinhood had $1.4 billion in margin loans outstanding.[22]

47.    In mid-December 2020, Robinhood cut its annual rate in half to 2.5%, making it even cheaper for users to borrow from Robinhood.[23] In making the announcement, Robinhood represented to customers that "[b]y lowering our margin rate, we're taking another step in passing the most value back to our customers."[24] Robinhood knew that lowering its margin rate would increase its own financial risk by increasing the margin trading activity on its platform, but it welcomes such risk in order to optimize its payment from order flow.

## II.    Robinhood Owes A Broker-Dealer's Duty of Care To Its Customers

48.    The Financial Industry Regulatory Authority (FINRA), a government-authorized regulator of brokerage firms, promulgates specific rules that help define broker-dealers' duty of care to their customers. Robinhood is registered as a broker-dealer, regulated by FINRA, and required to provide a duty of care to its customers.

49.    As a starting point, FINRA sets out "Know-Your-Customer" ("KYC") and suitability obligations. FINRA Rule 4512 requires broker-dealers to confirm and record certain information about a customer's financial circumstances, including the customer's identity, employment status, income, investment experience, net worth, investment objectives, and sources of income to ensure they have adequate funds to trade. FINRA Rule 2111 sets out the broker-dealer's duty to understand both the product and the customer to ensure that the investment is suitable.

50.    Additionally, in June 2019, the SEC adopted Regulation Best Interest ("Reg BI"), which requires brokers to act in a retail customer's best interest when making a recommendation of a securities transaction or an investment strategy involving securities, and the broker-dealer

---

[21]    Stephen Gandel, *Robinhood offers loans to buy stock – they were 14 times more likely to default*, CBS NEWS (Feb. 5, 2021), http://cbsn.ws/3rMkC0y.

[22]    *See* Robinhood Securities, LLC, Form X-17A-5 (June 30, 2020), https://bit.ly/3lLTJrq.

[23]    ROBINHOOD, *Robinhood Lowers Margin Interest Rate from 5% to 2.5%* (Dec. 21, 2020), http://bit.ly/3thMo54.

[24]    *Id.*

cannot place its own interests ahead of its customers' interests.[25] The SEC noted that Reg BI enhances the standard of conduct applicable to broker-dealers beyond the current suitability standards applicable to broker-dealers set forth in the FINRA rules and cannot be satisfied through disclosure alone.[26]

51.      FINRA has long urged firms like Robinhood to exercise with caution on options and margin trading and has recently raised awareness about the "risks associated with app-based platforms with interactive or 'game-like' features that are intended to influence customers, their related forms of marketing, and the appropriateness of the activity that they are approving clients to undertake through those platforms (e.g., under FINRA Rule 2360 (Options))."[27]

52.      In an Investor Alert published in April 2019, FINRA also raised awareness about the rise in so-called "social sentiment" investing tools which involve the use of social media sentiment information to inform investment decisions. FINRA explained:

> Depending on how it is presented, social sentiment information—particularly real-time discussion platforms and buy/sell indicators driven by social sentiment—can lead to emotionally-driven or impulsive investment decisions, which can be a risky way to approach investing.[28]

53.      More recently, FINRA published a report entitled *2021 Report on FINRA's Examination and Risk Monitoring Program* which specifically noted:

> 2020 witnessed a surge in new retail investors entering the markets via online brokers, as well as an increase in certain types of trading, including options. Some online broker-dealers' apps—as well as those offered by other financial services and consumer-oriented businesses—include interactive and "gamelike" features, as well as related forms of advertising and marketing. Such features affect many aspects of how firms interact and communicate with customers, from initial advertisements through the opening of

---

[25]      17 C.F.R. § 240.15l-1; Adopting Release, No. 34-86031 (June 5, 2019), https://bit.ly/3ldncKd.
[26]      Notably, both FINRA Rule 2111 and Reg BI distinguish between an *investment* (i.e., stocks, bonds and options) and an *investment strategy* (i.e., the use of margin trading or option strategies). Thus, broker-dealers have an obligation to ensure that both are suitable or in the best interest of the retail customer before they can recommend either one.
[27]      FINRA, *2021 Report on FINRA's Examination and Risk Monitoring Program*, at 2, https://bit.ly/3rGW1tO.
[28]      FINRA, *Social Sentiment Investing Tools—Think Twice Before Trading Based on Social Media* (Apr. 3, 2019), http://bit.ly/3rUF0wc.

accounts, recommendations and the presentation of different investment choices. While such features may improve customers' access to firm systems and investment products, they may also result in increased risks to customers if not designed with the appropriate compliance considerations in mind.

See FINRA, *supra* note 27, at 22.

54.     Exchange Act Rule 15c3-5 requires broker-dealers with market access or that provide market access to their customers to "appropriately control the risks associated with market access, so as not to jeopardize their own financial condition, that of other market participants, the integrity of trading on the securities markets, and the stability of the financial system."[29]

55.     Broker-dealers also have a duty to effectively manage their firm's liquidity and capital. As FINRA's Regulatory Notice 15-33 explains,

A fundamental purpose of the SEC's financial responsibility rules is to assure that broker-dealers have sufficient liquidity to conduct their business or to liquidate it without losses to customers. As part of a firm's obligation to supervise the businesses in which it engages, FINRA expects each firm to regularly assess its funding and liquidity risk management practices so that it can continue to operate under adverse circumstances, whether these result from an idiosyncratic or a systemic event. Sound liquidity risk management practices enhance investor protection because a firm's customers are more likely to continue to have prompt access to their assets.[30]

56.     The Regulatory Notice 15-33 continues that:

The primary role of liquidity-risk management is ensuring the availability of cash or highly liquid assets to support a financial institution's funding needs under both normal and stressed conditions. To do so, a financial institution needs a rigorous prospective assessment of its sources of funds to meet obligations, the amounts it will need when a stress occurs, the behavior characteristics of funding sources, and the limitations that funding sources may have or to which they may become subject.[31]

57.     Exchange Act Rule 17a-3(a)(23) requires firms that meet the thresholds specified under the rule to make and keep current records documenting the credit, market, and liquidity risk management controls established and maintained by the firm to assist it in analyzing and

---

[29]     17 C.F.R. § 240.15c3-5; Adopting Release, No. 34-63241 (Nov 3, 2010), https://bit.ly/2OuxXvM.
[30]     FINRA Regulatory Notice 15-33, http://bit.ly/3exBcNH.
[31]     *Id.*

managing the risks associated with its business.

58.     In addition, broker-dealers must create and maintain written business continuity plans (BCPs) relating to an emergency or significant business disruption. FINRA Rule 4370 requires that the BCP be reasonably designed to enable the firm to meet its existing obligations to customers during an emergency.

59.     Finally, FINRA sets certain standards for broker-dealers' communications with the public to ensure that they are fair, balanced, and not misleading. FINRA Rule 2210 requires, among other things, that all communications be based on principles of fair dealing and good faith, be fair and balanced, provide a sound basis for evaluating the facts "in regard to any particular security or type of security, industry, or service" and include all "material fact[s] or qualification[s]" necessary to ensure that such communications are not misleading.[32]

## III.     Robinhood Breached Its Duty To Its Customers

### A.     In January 2021, Robinhood's platform experienced a spike in customers taking long positions on heavily-shorted stocks.

60.     There were 3.7 million downloads of Robinhood in the month of January alone, according to app market intelligence firm SensorTower.[33]

61.     The spike in Robinhood's userbase in January 2021 coincided with a movement taking place on a Reddit forum known as r/WallStreetBets. In an ongoing (and exploding) discussion on r/WallStreetBets, average, everyday retail investors shared their opinions and analyses of stocks that appeared to be undervalued and presented good investment opportunities.

62.     As conversations on WallStreetBets spiked above 800,000 each day, daily downloads of Robinhood topped 400,000 per day:

---

[32]     FINRA Rule 2210(d)(1)(a), http://bit.ly/3qQ7jed.
[33]     *See* Maggie Fitzgerald, *The GameStop Mania Might Be Over, but Retail Investors Look Here to Stay*, CNBC (Feb 13, 2021), http://cnb.cx/30A85kG.



**Figure 3: Robinhood's daily downloads compared to r/WallStreetBets activity** [34]

63.     GameStop Corp. ("GME") was the stock that sparked the movement. GME is a video game retailer that operates about 5,000 stores across the country. As a brick-and-mortar store operating largely out of shopping malls that were forced to close during the COVID-19 pandemic, GME became a target of short sellers who essentially bet on GME's business to fail.

64.     But on January 11, 2021, GME reported huge increases in e-commerce sales.[35] That same day, GME announced that Ryan Cohen, the co-founder and CEO of the pet e-commerce website Chewy.com, joined its board of directors. Cohen had also invested $76 million in the company.[36] Hordes of retail investors gathering on r/WallStreetBets and other

---

[34]     *See id.*
[35]     GAMESTOP, *Gamestop Reports 2020 Holiday Sales Results* (Jan. 11, 2021), bit.ly/3cppl1J.
[36]     Matthew Fox, *Chewy founder Ryan Cohen has reaped a 1,700% return from a $76*

social media platforms took notice of the low stock price and soon pieced together that it was undervalued because of a coordinated effort by large financial institutions to short the stock.

65.    The skyrocketing number of posts on Reddit's r/WallStreetBets page in January was paralleled by a growing customer base at Robinhood, according to social media analytics platforms ListenFirst and SimilarWeb.[37]



**Figure 4: Robinhood's growing userbase compared to competitors**[38]

66.    While there is no public data available showing how much Robinhood or other

_million GameStop investment he made last year_, MARKETS INSIDER (Jan. 25, 2021), bit.ly/3cpEX55.
[37]    _See_ Fitzgerald, _The GameStop Mania Might Be Over, but Retail Investors Look Here to Stay_, _supra_ note 33.
[38]    _Id._

specific brokerage firms were involved in the GME trades, there can be little doubt Robinhood's users were a critical component of the surging stock prices. Thanks to Robinhood's easy market access and margin and options trading offerings, retail investors were able to pile on to purchase the shorted stocks. As a result, the tables began to turn for GME.

67.     On January 21, 2021, GME's stock price was valued at approximately $20 per share; by January 27, 2021, it had skyrocketed to nearly $350. The retail investors had effectively orchestrated a short squeeze of GME's stock.

68.     A short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. During a short squeeze, losses mount for investors in short positions (who have bet on the stock price going down), which pressures them to buy back the stock to exit their short positions and mitigate their losses. As short sellers cover their shorts (i.e., exit their short positions by buying back the stocks), they pile on to the purchasing frenzy, further increasing the price of the stock.

69.     While short squeezes are not unusual phenomena on Wall Street, the media took particular notice of this short squeeze because it was orchestrated by average, everyday retail investors using free trading platforms like Robinhood. Robinhood had given the "little guy" investors the leverage to push back against large financial institutions, exposing them to potentially catastrophic losses for betting against companies like GME that retail investors highly value. Wall Street's Melvin Capital Management (a prominent hedge fund), for example, was among the biggest losers. As a result of Melvin's losses on misplayed short bets, the well-known Wall Street firm was down 15 percent in the first three weeks of 2021.[39]

70.     For short sellers, the more a stock price increases, the greater the loss to the short seller. If the short seller wants to exit its short position in the face of rapidly increasing stock price, they must "buy back" the stock at the higher price to return to the institution they borrowed the share from.

---

[39]     Juliet Chung, *Short Bets Pummel Hot Hedge Fund Melvin Capital*, WALL ST. J. (Jan. 22. 2016), http://on.wsj.com/3ljfdeY.

71.    As small-time retail investors pumped up the stock price on heavily shorted stocks like GME during the first few weeks of 2021, short sellers, such as Melvin Capital, doubled down and loaded up on more short options, driving the price even higher. And as retail investors bid up the prices of these stocks, they exposed institutional short sellers to substantial—potentially disastrous—losses.[40]

72.    In the week of January 25, 2021, attention on r/WallStreetBets turned to other companies with heavily shorted stock, such as AMC, Nokia, Blackberry, and others. These stocks quickly appeared on Robinhood's "most popular" list, and institutional sellers braced for more short squeezes.

73.    On January 27, 2021, the SEC made a public statement about the volatile market situation:

> We are aware of and actively monitoring the on-going market volatility in the options and equities markets and, consistent with our mission to protect investors and maintain fair, orderly, and efficient markets, we are working with our fellow regulators to assess the situation and review the activities of regulated entities, financial intermediaries, and other market participants.[41]

74.    Many retail investors, like Plaintiff, held their long positions on Robinhood's "popular" stocks when the markets closed on January 27, 2021, with the reasonable expectation that the stocks would continue to increase in value the next day.

**B.    January 28, 2021**

75.    As the markets opened on January 28, 2021, Robinhood's customers woke up to discover that they were unable to purchase shares in GameStop Corp. (GME), AMC Entertainment Holdings, Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Castor Maritime Inc. (CTRM), Express, Inc. (EXPR), Koss Corp. (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc.

---

[40]    Matt Phillips and Taylor Lorenz, *'Dumb Money' Is on GameStop, and It's Beating Wall Street at Its Own Game*, N.Y. TIMES (Jan. 27, 2021), http://nyti.ms/30Gn0tL.
[41]    Joint Statement, U.S. Securities and Exchange Commission, Joint Statement Regarding Ongoing Market Volatility (Jan. 27, 2021), http://bit.ly/30CXKo9.

(SNDL), Tootsie Roll Industries, Inc. (TR) and trivago N.V. (TRVG). Robinhood had deactivated the "buy" feature on its platform for these select "popular" stocks, leaving its users with only the option to sell their shares.[42]

76.     Further, Robinhood users who had placed orders overnight on January 27, 2021 to purchase these stocks as soon as the markets opened on January 28, 2021 discovered that their purchase orders had been canceled. Robinhood's messaging erroneously informed these users "You've canceled your order," even though Robinhood made the unilateral decision to cancel the orders.

77.     In short, on January 28, 2021, amidst soaring stock prices and as short sellers scrambled to cover their positions, Robinhood effectively shuttered the retail market for these 13 stocks by stopping its users from purchasing them.

78.     With Robinhood's limits in place, the prices of these 13 stocks plummeted. The price of GME's stock, for example, halved in one day, dropping from $462.42 to $193.60 per share at the close of January 28.

---

[42]     Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021), http://cnb.cx/3rJIul9.



**Figure 5: Stock performance before and after Robinhood's January 28, 2021 restrictions.**[43]

79.    Robinhood's trade limits on these 13 stocks sent waves of confusion and uncertainty throughout the retail investor community, causing the share values to drastically change course on January 28, 2021 as retail investors grew distrustful and uncertain about their ongoing access to the markets. Robinhood customers were allowed to close their positions and liquidate their shares at the same time they were restricted from buying them, which sparked a massive sell-off.

80.    Robinhood's decision to restrict users from buying certain stocks while allowing

---

[43]     Pippa Stevens, *Stocks on the Robinhood restricted trading list like AMC and Koss surged on Friday*, CNBC (Jan. 29, 2021), http://cnb.cx/3l9utuR.

those holding the stocks to sell them was, in effect, an interference with the free market. It shrank both the demand and the value of these stocks, to the detriment of Robinhood users holding long positions in them.

81.    Facing investor backlash, Robinhood loosened its restrictions over the next few days, initially allowing one share per user on January 29, then gradually allowing for more shares:

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AMC | 10 | 10 |
| BB | 700 | 700 |
| EXPR | 20 | 20 |
| GME | 1 | 5 |
| GNUS | 600 | 600 |
| KOSS | 2 | N/A |
| NAKD | 600 | N/A |
| NOK | 2000 | 1000 |

**Figure 6: Robinhood's restricted stocks as of January 31, 2021.**[44]

82.    As Robinhood's restrictions loosened, the share prices of the stocks increased, but none of them recovered their pre-restriction value.[45] For example, on January 29, after Robinhood allowed each user to purchase one share of GME stock, the stock value increased

---

[44]    Mike Murphy, *Robinhood slims restricted list to 8 stocks, but users can still only buy 1 share of Gamestop*, MARKET WATCH (Jan. 31, 2021), http://on.mktw.net/3rJsj7E.
[45]    Paul R. La Monica, *Robinhood to ease restrictions. GameStop stock soars 100%*, CNN BUSINESS (Jan. 29, 2021), http://cnn.it/2PZwgXO.

significantly, closing that day at $325, up from $193.60 the previous day. However, with Robinhood's one-share-per-user restriction in place, demand for GME's stock began to curb, and by February 2, 2021, the share price declined to $90 per share.[46]

83.     Had Robinhood not abruptly halted trading of these stocks on January 28, 2021, their demand would not have been interrupted and their stock prices would have continued to increase.

    **C.     Robinhood provided opaque explanations for its decision to restrict trading.**

84.     Robinhood failed to provide its users with an immediate explanation for its abrupt actions disabling users from buying certain stocks. The only explanation initially available to Robinhood users came in the form of a generic "Why don't I see a buy button?" section of its website, which offered three reasons for the disappearance of the buy button: a) "It's a foreign stock, which we don't support." B) "It's an over-the-counter stock or a warrant, which Robinhood generally doesn't support." C) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized."[47] This explanation made little sense to Robinhood users, including Plaintiff, because the stocks affected were not foreign, OTC, or undergoing "corporate action."

85.     As a result, Robinhood traders on social media speculated that Robinhood was actively trying to drive the stock prices down in order to help institutional short sellers who faced catastrophic losses if share prices continued to rise.[48] This backlash led a significant number of users to close their positions on the restricted stocks and leave the platform.

86.     Days after enacting the trade restrictions, Robinhood finally emailed its customers to explain its actions, stating:

    We did this because the required amount we had to deposit with the clearinghouse was so

---

[46]     Gamestop Corp., *Stock Price History*, YAHOO! FINANCE, http://yhoo.it/2PZwGNS (last visited Mar. 12, 2021).
[47]     ROBINHOOD, *Why don't I see a buy button?*, http://bit.ly/3rHIbHJ (last visited Mar. 12, 2021).
[48]     Lance Lambert, *Robinhood comes clean with its millennial traders: 'We certainly weren't trying to help hedge funds'*, FORTUNE (Feb 2, 2021), http://bit.ly/2OLekQa.

large—with individual volatile securities accounting for hundreds of millions of dollars in deposit requirements—that we had to take steps to limit buying in those volatile securities to ensure we could comfortably meet our requirements.[49]

87.     The clearinghouse that Robinhood was referring to is the National Securities Clearing Corporation ("NSCC"), a subsidiary of the central clearing entity and holding company, the Depository Trust & Clearing Corporation ("DTCC"). The DTCC is a member-owned and directed company that provides clearing and settlement services to the financial markets. When customers buy or sell securities on Robinhood, Robinhood Financial, as the introducing broker, sends the order to Robinhood Securities, the clearing broker, to route the order for execution by a trading firm, which submits the trade to the relevant clearing entity to clear and settle it.

88.     It takes a few days for the clearinghouse to clear and settle each trade. The goal of the DTCC is to protect the broader financial system from trading defaults that may occur during this settlement period. If a client is unable to repay its margin loans, the broker-dealer must eat the losses to hold up its end of the transaction. To ensure that both sides follow through on a given trade, the DTCC requires each side to post collateral for the two-day period between when a trade is executed and when it settles. These deposit requirements, referred to as the "Value-at-Risk" collateral ("VaR"), are designed to avoid a scenario where a broker loses so much money before a trade is cleared that the firm can't hold up its end of the transaction.

89.     Robinhood's answer, put otherwise, was that the company's hand was forced by volatile market conditions and the concomitant increase in regulatory capital obligations.

90.     In the aftermath of Robinhood's trade restrictions, the United States House Committee on Financial Services called on Robinhood's Chief Executive Officer Vlad Tenev to provide more information to Congress about Robinhood's decision to restrict trade.[50]

91.     In his February 18, 2021 written response to the inquiries from Congress, Mr.

---

[49]     Emma Newburger, *Robinhood says restrictions on GameStop due to tenfold increase in clearinghouse deposit requirements*, CNBC (Jan. 30, 2021), http://cnb.cx/3lcbgsv.
[50]     U.S. House Committee on Financial Services, *Waters Announces Robinhood, Citadel, Melvin Capital, Reddit CEOs and Keith Gill to Testify at Committee Hearing*, https://bit.ly/3cpl4et (last visited Mar. 12, 2021).

Tenev explained that "each trading day by 10:00 a.m. ET, clearing brokers like Robinhood Securities must satisfy clearinghouse deposit requirements to support their customer trades during the settlement period."[51]

92.     According to Mr. Tenev's testimony, "on January 25, 2021, Robinhood Securities' collateral obligation from NSCC, its principal clearinghouse, totaled approximately $124 million."[52]

93.     Mr. Tenev confirmed that "[b]y January 27, Robinhood Securities increased the margin maintenance to 100 percent for GameStop and other securities, making them non-marginable." He continued, "[t]his meant that customers had to pay cash to purchase these securities and they could not use the securities as margin collateral to buy other stocks on margin. Robinhood also began limiting customers from opening new options positions in GameStop and certain other securities." These actions, he explained, were taken "for risk management purposes."[53]

94.     On January 27, 2021, Robinhood reported having a "daily VaR Requirement Start of Day" of $282 million, and a "Daily VaR Requirement End of Day" of $690 million.[54]

95.     Mr. Tenev further explained that "[a]t approximately 5:11 a.m. EST on January 28, the NSCC sent Robinhood Securities an automated notice stating that Robinhood Securities had a deposit deficit of approximately $3 billion. That deficit included a substantial increase in Robinhood Securities' VaR based deposit requirement to nearly $1.3 billion (up from $696 million), along with an 'excess capital premium charge' of over $2.2 billion."[55]

96.     Mr. Tenev continued, "In total, the NSCC automated notice indicated that

---

[51]     *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 9 (2021) [hereinafter *Game Stopped?*] (statement of Vladimir Tenev, CEO, Robinhood, Fin. Serv.).
[52]     *Id.*
[53]     *Id.*
[54]     *Id.* at 10
[55]     *Id.* at 9. According to Robinhood, "On January 28 the amount of the NSCC VaR charge" (which was reportedly nearly $1.3 billion) "exceeded the amount of net capital at Robinhood Securities, including the excess net capital maintained by the firm[,]" which triggered "a special assessment—the 'excess capital premium charge.'" *Id.*

Robinhood Securities owed NSCC a total clearing fund deposit of approximately $3.7 billion. Robinhood Securities had approximately $696 million already on deposit with NSCC, so the net amount due was approximately $3 billion."[56]

97.     Not much information is publicly available regarding how the DTCC calculates the collateral deposit requirement. On January 31, 2021, Mr. Tenev, while participating in an invitation-only interview on the application Clubhouse, stated, "[w]e don't have the full details" of how the NSCC arrived at its demands, and admitted "[i]t would obviously be ideal if there was a little bit more transparency so we could plan better around that."[57]

98.     However, the DTCC says that to make collateral calls predictable, it provides "reporting and other tools to our clearing members to help them anticipate their margin requirements for a particular portfolio."[58]

99.     At least this much is generally understood: the more a brokerage is exposed to volatile shares, the more collateral the DTCC will demand from it. And if the brokerage has less capital on hand, the DTCC may demand an additional surcharge on its deposit. On January 28, that surcharge (or "excess capital premium charge") ostensibly accounted for over $2.2 billion of Robinhood's clearing demand.

100.    Robinhood reportedly informed the NSCC of its intention to implement trading restrictions early in the morning on January 28, which led the NSCC to waive its excess capital premium charge entirely. "Robinhood Securities then deposited approximately $737 million with the NSCC that, when added to the $696 million already on deposit, met the revised deposit requirement for that day."[59]

---

[56]     *Id.*
[57]     *See* Mike Butcher, *Elon Musk Busts Clubhouse Limit, Fans Stream to YouTube, He Switches to Interviewing Robinhood CEO*, TECHCRUNCH (Feb. 1, 2021), https://tcrn.ch/2Nelfkr.
[58]     DTCC, *The Value of Financial Market Infrastructures: A Q&A with Murray Pozmanter, DTCC Head of Clearing Agency Services and Global Business Operations* (Feb. 02, 2021), https://www.dtcc.com/dtcc-connection/articles/2021/february/02/the-value-of-financial-market-infrastructures.
[59]     *Game Stopped?*, *supra* note 51, at 10.

101.     There are several problems with Robinhood's description to Congress of its decision to restrict trading on January 28, 2021.

102.     First, Robinhood failed to explain how the NSCC calculated Robinhood's deposit requirements, except to offer that "the clearinghouse looks at unsettled trades and applies a number of risk-based metrics," that "[t]he clearinghouse may also assign additional collateral requirements," and that "[d]epending on a particular day's deposit requirement at the clearinghouse, Robinhood Securities may be required to deposit additional money with the clearinghouse during the day."[60] At best, this opaque description reflects that Robinhood's own executives failed to diligently investigate and understand the company's margin requirements. At worst, it reflects their efforts to obfuscate precisely how and why the company's deposit amounts changed over the course of the week, which had more to do with Robinhood's own negligence than anything else.

103.     Indeed, Senator Elizabeth Warren took interest in the role that Robinhood's risk-optimized business model played in the events that led to its trade restrictions, asking the company if "Robinhood may have been exposed to too much risk associated with margin trading."[61] Robinhood dodged that question entirely. Further, when Senator Warren asked about "the average total margin among Robinhood margin account holders," Robinhood evasively responded that, "Under current rules, RHF is not required to collect and disclose the number of customers who hold margin accounts."[62] But Robinhood is required to maintain sufficient capital to ensure the firm can withstand foreseeable stress conditions—such as the events that occurred on January 28, 2021—and to the extent its total margin impacted its capital requirements, Robinhood should have monitored and managed that risk.

104.     The second problem with Robinhood's explanation to Congress is that it distorts

---

[60]     *Id.* at 8-9
[61]     *See* Press Release, Elizabeth Warren, *Warren Shares New Details on Robinhood's Controversial Actions During GameStop-Fueled Market Volatility* (Feb 17, 2021), https://bit.ly/3rMpSRy.
[62]     *Id.*

the nature of the company's collateral crunch on January 28. Mr. Tenev's testimony was careful to illustrate that the company's deposit requirement had "skyrocketed overnight" and had reached "nearly ten times the amount required just days earlier," a theme the company has frequently underscored in order to shift the blame to flaws in the trade settlement process. For example, Mr. Tenev provided Congress with a graphic outlining the company's "daily" deposit requirements, underscoring a spike from $690 million on January 27 to $1.4 billion on January 28. But this graphic is misleading, in part because Robinhood only paid approximately $737 million (not $1.4 billion) to meet its daily depository requirement on January 28, that is, within $40 million of (and hardly ten times) the demand from the day before. To be sure, Robinhood's *net* deposit requirements appeared to double between January 27 and January 28 because the company had apparently carried over collateral debt from the day before. But the figures and images that Robinhood provided to Congress, on closer look, obfuscate how and why Robinhood's depository requirements changed over the course of the week.[63]

105.    The third problem with Robinhood's explanation is that it reportedly raised over $1 billion in new capital by the evening of January 28, which strongly suggests that the company was in a cash crunch. It also suggests that Robinhood would have had little issue raising capital *ex ante* had it more diligently monitored its margin requirements, and it could have proactively done so to ensure that a drastic trading suspension would not be required in the wake this foreseeable event.

106.    Robinhood wants its users to believe that the company's hands were tied on January 28 because of unprecedented volatility in the markets "and the related NSCC depository requirements." [64] The reason Robinhood is careful to exclude any details about how the one event led to the other is simple: Robinhood does not want its users to know that it was Robinhood's risky lending practices and mismanagement of cash flow that caused its customers to lose access to the markets.

---

[63]      *Game Stopped?*, *supra* note 51, 59, at 9-10, 12.
[64]      *Id.* at 10.

107.    Robinhood knew the investment strategies of its customer base; it encouraged investors to follow "popular" stocks like GME and other high-volatility stocks and to trade frequently.

108.    Robinhood also knew that its customers were taking on significant margin debt. Indeed, Robinhood cut its margin requirements at the end of 2020 in an attempt to drive more trading activity. Robinhood knew that expanding margin trading among its userbase, while relying only on users' self-reported financial conditions to verify their eligibility for margin trading, would expose the firm to significant financial risk, which would in turn increase Robinhood's collateral requirements with its clearinghouse.

109.    Additionally, Robinhood knew that its customers were partaking in volatile and risky investment activities, particularly with regard to options contracts, and that this too would expose the firm to significant financial risk and increase its collateral requirements.

110.    Robinhood further knew that its customer base was expanding rapidly in the month of January and that its customers were purchasing volatile stocks on margin, with a risk that if the stocks crashed, the client margin debt may not get paid back. For example, Robinhood knew from the beginning of January through the end of the final week that GME's stock price had nearly quadrupled in value, that this posed a systemic risk to the stock market, and that new retail investors were piling onto its application to trade this particular stock. Robinhood knew that it would be required to draw on credit and other sources of funding to front its increased collateral to the clearinghouse.

111.    It is foreseeable that a broker-dealer will face higher deposit requirements in volatile periods to protect against a member default. Robinhood knew that there was a risk that GME and other popular trades placed on its platform in January 2021 may not settle, which meant that it would need to have more cash on hand to cover shortfalls and meet clearinghouse requirements. Accordingly, Robinhood could reasonably foresee the risk that its clearing deposit requirements would exceed its cash on hand.

112.     Robinhood also knew that in January 2021, a significant market share of transactions involving GME, AMC, Nokia, and certain other stocks were taking place on Robinhood's platform. Robinhood further knew that its platform empowered the volatility (and popularity) of these stocks in January 2021 and that any restrictions on buying these stocks through the Robinhood platform would drive down the price of these stocks. Robinhood also knew that the majority, if not all, of retail traders purchasing these stocks on Robinhood's platform in January 2021 had taken long positions on the stocks, and their investment strategies would be disrupted if Robinhood interfered with the market by halting trading for any period of time. Accordingly, Robinhood could reasonably foresee the harm to its users that would result from limiting certain popular trades during an active and volatile trading cycle.

113.     Nevertheless, at all relevant times, Robinhood maintained its "game-like" platform design and pushed communications to its users intended to influence customers to engage in volatile trading activity, which it subsequently halted. While providing its customers with information designed to encourage them to trade volatile stocks, Robinhood did not adequately warn them of the likelihood that Robinhood would limit these same trades, or that Robinhood's trade restrictions would have a drastic impact on the market and the prices for certain volatile stocks.

114.     Robinhood had plenty of time to develop a risk-management plan that would allow it to take other actions to ensure that it did not disrupt its customers investment strategies or the retail market at large, and particularly to ensure that it did not do so on a discriminatory basis. For example, Robinhood could have limited margin trading on all stocks long before January 27 to mitigate some of the company's risk exposure and to ratchet down its depository requirements during this period of foreseeable volatility. Moreover, it could have secured additional capital long before January 28, which would have allowed it to meet its deposit demands without locking users out of the market.

115.     However, Robinhood chose not to raise capital *ex ante* to mitigate the risks for its

customers, likely because its executives did not want to dilute their shares of corporate profits. Venture capital investors were ready and willing to double down on investments in Robinhood, even despite the company's so-called "skyrocketing" new capital requirements.[65] But instead of utilizing these investments in the week preceding January 28 – ensuring that its users would retain fair and open access to the markets in the middle of an active trading cycle— Robinhood waited until the eleventh hour to seek capital reinforcements. Sacrificing the share prices of the most popular stocks held among its users, Robinhood's executives hedged their own financial interests on the hope that no real financial or regulatory punishment would result from their betrayal of the retail investor community.

116.    Robinhood's decision to suspend trading on January 28, 2021 "for risk management purposes" was attributable, above all else, to its own negligence and self interest.

117.    Robinhood breached its duty of care to its customers by failing to monitor the financial, regulatory, and other risks associated with its customer base and investment offerings and by failing to reasonably design risk management controls that would have allowed its customers to continue trading on January 28, 2021.

### FACTS SPECIFIC TO PLAINTIFF MILHOUSE

118.    Plaintiff Mark Milhouse opened an Instant account and was an active user on Robinhood throughout January 2021. In the weeks and months preceding January 28, 2021, he made dozens of orders through Robinhood's platform, for which Robinhood profited from payments for order flow.

119.    On January 27, 2020, Plaintiff purchased shares of Nokia stock at $7.21 per share and at $7.43 per share. He also purchased shares of AMC stock at $16.26 per share and $19.40 per share.

120.    Plaintiff purchased Nokia and AMC shares on January 27 because these companies, like GME, had recently caught the attention of the retail investor community on

---

[65]    *See* Kate Rooney, *Why Investors Were Willing to Write Robinhood a $3 Billion Check During the GameStop Chaos*, CNBC (Feb 3, 2021) https://cnb.cx/3lfmsoe.

r/WallStreetBets. Plaintiff believed that the stocks were undervalued due to efforts to short the shares.

121.    As Robinhood users took notice of AMC and Nokia's share prices during the week of January 25, 2021, both stocks experienced exponential growth. For example, AMC's share price opened on January 26 at $5.09 per share and closed on January 27 at $19.90. Nokia's share price opened on January 26 at $4.99 per share and closed on January 27 at $6.55.

122.    Plaintiff purchased both shares on January 27 because there was high demand among the r/WallStreetBets community and he reasonably believed that as retail investors continued to purchase the stocks, the share prices would continue to rise. On January 27, AMC's stock finished the day with a 301.21% gain, closing at $19.90 per share, slightly below the stock's high of the day at $20.36.[66] Nokia finished the day up 133% for the week.[67] In fact, AMC and Nokia's stocks were the first- and second-most active on the New York Stock Exchange on January 27, 2021.[68]

123.    Plaintiff decided to hold his shares on January 27 and planned to purchase additional shares on January 28 because he believed that he and other retail investors would continue to have access to the market to purchase the shares through Robinhood's platform and would continue to purchase them, increasing the share value.

124.    However, immediately after Robinhood restricted its users from buying the stocks on January 28, 2021, the prices of both stocks went down.

125.    For example, on January 27, 2021, AMC stock opened at $20.34 per share. On January 28, 2021, after Robinhood suspended trading on AMC stock, the share price closed at $8.63.

126.    The stock prices decreased because Robinhood users were locked out of buying

---

[66]    Pippa Stevens, *AMC share price quadruples as retail traders raid hedge-fund short targets*, CNBC (Jan. 27, 2021), https://cnb.cx/3ezCxnq.
[67]    *Nokia not aware of any reason for share surge*, REUTERS (Jan. 27, 2021), https://reut.rs/3vmEppe.
[68]    Tomi Kilgore, *Nokia stock soars to a record gain on record volume, for no apparent reason*, MARKETWATCH (Jan. 28, 2021), https://on.mktw.net/38RwQxx.

them, lost confidence in the market, and sold their shares in panic. Upon learning that he could no longer purchase shares in AMC, Nokia, or the other restricted stocks on January 28, Plaintiff immediately placed an order to sell his Nokia and AMC shares because there was panic in the marketplace over Robinhood's trading restrictions, there was no explanation from Robinhood, and he believed that he needed to sell his shares in order to mitigate his impending losses. (Plaintiff ultimately canceled his sell orders, however other panicked Robinhood users followed through and closed their positions, causing the share prices to drop.)

127.    If Robinhood had not restricted trades, the prices of these stocks would have increased, rather than decreased, because there was high demand for them among Robinhood's users. Indeed, when Robinhood partially lifted its trading restrictions and its users regained some access to the market on January 29, 2021, AMC's share price increased, closing that day at $13.26.[69] Nokia's share price likewise increased.

128.    However, Robinhood's restrictions created colossal panic, anger, and confusion among the retail investor community and did untold damage to the short-squeeze efforts that had taken place that week. As a result, Plaintiff's long positions on AMC and Nokia were damaged, and Plaintiff lost the value of the shares he had purchased from Robinhood's platform. He also lost an immeasurable investment opportunity that was stolen from him when Robinhood interfered with the markets and drove down the stock's price.

## CLASS ACTION ALLEGATIONS

129.    **Class Definition**: Plaintiff Mark Milhouse brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a class of all others similarly situated, defined as follows:

> **Class**:  All persons in the United States that purchased and held options or securities through Robinhood in one or more of the following stocks on or before January 27, 2021: GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Castor Maritime Inc. (CTRM), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand

---

[69]    AMC Entertainment Holdings, Inc., *Stock Price History*, YAHOO! FINANCE, http://yhoo.it/3lKu8yL (last visited Mar. 12, 2021).

Group Ltd. (NAKD), Nokia Corp. (NOK), trivago N.V. (TRVG), Tootsie Roll Industries Inc. (TR), and Sundial Growers Inc. (SNDL).

(the "Class").[70]

130.     Excluded from the Class are the Robinhood entities and their current employees, counsel for either party, as well as the Court and its personnel presiding over this action.

131.     This action has been brought and may properly be maintained as a class action against Robinhood pursuant to the provisions of Federal Rule of Civil Procedure 23.

132.     **Numerosity:** The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands if not millions. Subclass members are likely in the thousands. All Class members may be notified of the pendency of this action by reference to Robinhood's records, or by other alternative means.

133.     **Commonality:** Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Class. These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

a.     Why Robinhood restricted trading on January 28, 2021;

b.     Whether Robinhood's capital management was adequate;

c.     Whether Robinhood maintained adequate risk-management controls in light of its business model;

d.     Whether Robinhood's conduct in connection with the Restricted Stocks was negligent;

e.     Whether Robinhood breached its fiduciary duties to its users;

---

[70]     For the sake of simplicity, the stocks delineated in the Class definition are referred to herein as the "Restricted Stocks."

f.      Whether Robinhood was unjustly enriched by its conduct with regard to the
Restricted Stocks;

g.      Whether Robinhood's conduct violates California's Unfair Competition Law,
Bus. & Prof. Code § 17200, *et seq.*;

h.      Whether Plaintiff and the Class were injured by Robinhood's conduct, and if so,
the appropriate measure of damaged, restitution, disgorgement, and other
monetary relief.

134.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the
proposed Class in that the named Plaintiff was a Robinhood user during the class period, had
purchased one or more of the Restricted Stocks through Robinhood before January 28, 2021,
and thus sustained damages when Robinhood restricted trading of the Restricted Stocks.

135.    **Adequate Representation:** Plaintiff will fairly and adequately represent the
interests of the Class in that he has no conflicts with any other Class members. Plaintiff has
retained competent counsel experienced in prosecuting complex class actions in federal court,
including those involving financial services, and they will vigorously litigate this class action on
his behalf and on behalf of the class.

136.    **Predominance and Superiority:** There is no plain, speedy, or adequate remedy
other than by maintenance of this class action. A class action is superior to other available
means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate
actions by individual Class members would create the risk of inconsistent or varying
adjudications, establishing incompatible standards of conduct for the Defendant. Additionally,
given the relatively modest damages sustained by most individual Class members, few, if any,
proposed Class members could or would sustain the economic burden of pursuing individual
remedies for Robinhood's wrongful conduct. Treatment as a class action will achieve
substantial economies of time, effort, and expense, and provide comprehensive and uniform
supervision by a single court. This class action presents no material difficulties in management.

137.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will permit an orderly and expeditious administration of the claims of the Class, will foster economies of time, effort, and expense, and will insure uniformity of decisions. The prosecution of individual actions by Class members would create the risk of (a) inconsistent or varying adjudications with respect to individual Class members; and (b) be grossly impracticable because the cost of vindicating an individual Class member's claim would likely exceed the value of the claim.

138.    Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

139.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Robinhood has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

140.    The amount of damages available to the individual Plaintiff is insufficient to make litigation addressing Robinhood's conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent

or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

141.    Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

142.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

143.    As a provider of financial services and a registered securities investment broker-dealer, Robinhood has a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers. This duty includes the duty to have reasonably designed risk-management controls and contingency funding plans to manage the financial, regulatory or other risks associated with the firm's business activity.

144.    Robinhood's business activity—which involves targeting inexperienced retail investors, offering an app with "game-like" features designed to influence them to engage in frequent and volatile trading activity, and providing sophisticated and high-risk investment offerings like margin and options trading—is associated with an unusually high degree of financial risk.

145.    Robinhood breached its duties by, among other things, halting customer trades during a foreseeably volatile and high-demand trading period; failing to have adequate capital to meet its depository requirements; failing to timely notify its users that their ability to trade would be suspended; and failing to maintain adequate financial risk controls to prevent the suspension of trading during an active trading cycle. Robinhood also failed to develop a contingency plan that would allow its customers to carry out their investment strategies while the firm operated in

a stressed environment and failed to develop a process for accessing capital during a stress event.

146.     The stress event that led to Robinhood's trade suspension was foreseeable. Broker-dealers can anticipate when there will be surges in their clearing deposit demands and should have a cash management plan to cover those surges. Robinhood failed to adequately manage its cash flow, and in the face of a liquidity crunch, it sacrificed its customers.

147.     Robinhood's trade restrictions caused injury to Plaintiff and the Class members because they needed free access to the market in order to complete their investment strategies, both to protect the rising value of the stocks they had already purchased and to purchase volatile stocks at reduced prices. When Robinhood cut off access to the market for the largest source of the stock's demand, it caused the stock prices to fall (and Plaintiff and the Class members to lose money on their investments). It also cut off the investors' longer-term strategy to purchase the stocks as they continued to rise in value. Because the investors had already opened positions on the stocks with this long-term plan in mind (to continue buying and selling as the stock price fluctuated in value), their investment accounts were injured when they were unable to complete their strategies.

**SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

148.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

149.     As a provider of financial services and a registered securities investment broker-dealer, Robinhood was a fiduciary to Plaintiff and the Class members at all times relevant herein and owed them the highest good faith in acting on their behalf. As a broker-dealer, Robinhood provides securities trading services by taking, entering, and executing orders, provides information and advice to customers on investments and investment strategies (although it is careful to disclaim this conduct), and maintains discretionary control over customer accounts.

150.     For example, Robinhood reserves the right to buy or sell securities and liquidate accounts "in its sole discretion." Accordingly, Robinhood expressly assumes all the fiduciary

responsibilities associated with its retention of discretion to exercise trades and other transactions with or without customer direction.

151.    Robinhood breached its fiduciary duties to Plaintiff and the Class by, among other things, halting customer trades during a foreseeably volatile and high-demand trading period; failing to have adequate capital to meet its depository requirements; failing to timely notify its users that their ability to trade would be suspended; and failing to maintain adequate financial risk controls to prevent the suspension of trading in the week of January 28, 2021. Robinhood also failed to develop a contingency plan that would allow its customers to carry out their investment strategies while the firm operated in a stressed environment and failed to develop a process for accessing capital during a stress event.

152.    Robinhood's conduct caused Plaintiff and the Class as described above, and these losses reflect damages to Plaintiff and the Class in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### Unjust Enrichment
#### (On Behalf of Plaintiff and the Class)

153.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

154.    Plaintiff and the Class conferred a monetary benefit on Robinhood when they placed orders for execution through Robinhood's application.

155.    Robinhood appreciates or has knowledge of such benefit.

156.    Plaintiff and the Class reasonably believed that Robinhood would have reasonably designed risk-management controls and contingency funding plans in place to manage the financial, regulatory or other risks associated with the firm's business activity.

157.    Plaintiff and the Class reasonably believed that, by operating with standard risk-management controls, Robinhood would not halt trading as a "risk management strategy" during a period in which it was crucial for Robinhood users to have open access to the markets in order to carry out their investment strategies. Plaintiff and the Class placed orders through Robinhood's application based on this reasonable belief.

158.     Plaintiff and the Class would not have used Robinhood's application if they knew that Robinhood did not have these controls in place.

159.     Robinhood thus unjustly received and retained a benefit from Plaintiff and the Class when it accepted their orders without having adequate controls in place.

160.     Principles of equity and good conscience require Robinhood to return the payment for order flow it received from Plaintiff and the Class's orders to Plaintiff and the Class.

161.     Accordingly, Plaintiff and the Class seek disgorgement and restitution of any money received by Robinhood, in an amount to be determined at trial, as a result of the conduct alleged herein.

**FOURTH CAUSE OF ACTION**
**Violation of California Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the Class)**

162.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

163.     Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code § 17200, *et seq.*, because Robinhood's conduct is unlawful and unfair as described herein.

164.     Plaintiff, the Class, and Robinhood are "persons" within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

165.     The UCL prohibits any unlawful and unfair business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practices that occurred in connection with the provision of its financial and investment broker services.

166.     **Unlawful prong**: Robinhood's conduct, as described herein, violated the UCL's unlawful prong because it: (1) constitutes negligence; (2) violated the SEC's Reg BI under the Securities Exchange Act of 1934; (3) violated various FINRA rules, including but not limited to FINRA Rules 2111, 2210, 2220, and 4370; and (4) constitutes a breach of fiduciary duty.

167.     **Unfair prong**: Robinhood's conduct, as described herein, violated the UCL's

unfair prong because it violated established public policy intended to protect retail investors from unfair and discriminate treatment and has caused injuries to Plaintiff and the Class that outweigh any purported benefit. The utility of Robinhood's decision to not raise additional capital *ex ante* and to halt trades as necessary to meet its deposit demands is far outweighed by the gravity of harm to consumers who have incurred losses in the value of their securities and their lost investment opportunities that they would not have otherwise lost had Robinhood not interfered with consumers' market access.

168.   Plaintiff and the Class have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of Robinhood's conduct.

169.   The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other counts of this complaint. *See* Cal. Bus. & Prof. Code § 17205.

170.   As a direct and proximate result of Robinhood's unlawful and unfair business practices, as alleged in the conduct described herein, Plaintiff and the Class have been damaged and have suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mark Milhouse, individually and on behalf of the Class, prays for the following relief:

(a)   An order certifying the Class as defined above, appointing Plaintiff Milhouse as the representative of the Class, and appointing his counsel as Class Counsel;

(b)   An award for Plaintiff and the Class for: (i) actual, compensatory, and consequential damages, (ii) punitive and treble damages, as allowed for under the relevant laws,

(iii) restitution, disgorgement, reimbursement, and/or other equitable relief as the Court deems just and proper, (iv) costs, including experts' fees and attorneys' fees and expenses, and any other reasonable costs, and (v) pre- and post-judgment interest, to the extent allowed under the relevant laws; and

      (c)     Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**MARK MILHOUSE**, individually and on behalf of all others similarly situated,

Dated: March 23, 2021        By: /s/ Eve-Lynn Rapp
                                 *One of Plaintiff's Attorneys*

Eve-Lynn Rapp
erapp@edelson.com
Éviealle Dawkins
edawkins@edelson.com
EDELSON PC
350 North LaSalle, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Lily E. Hough
lhough@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
Tel: 415.212.9300
Fax: 415.373.9435